## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| **PATRICK J. GANNON**, | ) | Chapter 7 |
| | ) | Case No. 15-11576-MSH |
| Debtor | ) | |
| | ) | |
| | ) | |
| | ) | |
| **MICHELLE McGUINNESS** | ) | Adversary Proceeding |
| **and WIILIAM DUGGAN,** | ) | No. 15-1160 |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | |
| **PATRICK J. GANNON**, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## MEMORANDUM OF DECISION

### I. <u>Introduction</u>

This adversary proceeding was initiated by the filing of a two-count complaint by

Michelle McGuinness and her husband, William Duggan, against the defendant and the debtor in

the main case, Patrick J. Gannon. The plaintiffs seek a judgment that, pursuant to subparts (a)(2)

and (a)(4) of Bankruptcy Code § 523,[1] a debt they claim is owed to them by Mr. Gannon is

excepted from Mr. Gannon's bankruptcy discharge. The plaintiffs contend that Mr. Gannon, a

building contractor, engaged in misrepresentation, fraud, and fiduciary defalcation in obtaining

---

[1] All references to the Code or Bankruptcy Code refer to title 11 of the United States Code, 11
U.S.C. § 101 *et seq*.

payment from them in connection with his construction of an addition and other work on their

home.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## II. <u>The Bankruptcy Case and This Adversary Proceeding</u>

On April 24, 2015, Mr. Gannon filed a voluntary petition for relief under chapter 7 of the

Bankruptcy Code.  In schedule F of the schedules of assets and liabilities filed in support of his

petition, he listed the plaintiffs as general unsecured creditors in the undisputed amount of

$161,692 and described them as "Plaintiffs in construction litigation."  He listed his ownership in

"Patrick J. Gannon Construction Incorporated," which I presume to be the same entity that

contracted with the plaintiffs, as an asset on schedule B.[2]

The plaintiffs filed their complaint in this court against Mr. Gannon on September 3,

2015, seeking to exclude their claims from Mr. Gannon's discharge based on Code § 523(a)(2)[3]

(count 1) and Code § 523(a)(4) (count 2). The plaintiffs attached to their complaint a copy of a

state court complaint they had filed in 2015 against Mr. Gannon and Patrick J. Gannon

Construction Incorporated which asserted claims for breach of contract, negligence, fraud,

misrepresentation, and lack of good faith and fair dealing.  Their breach of contract count

claimed damages of $161,692 (the same amount set forth in Mr. Gannon's schedule F).

In defense to the plaintiffs' claims in this adversary proceeding, Mr. Gannon asserts that

the plaintiffs have no claim against him personally but instead have a claim against his

construction company exclusively and that, in any event, they brought their damages upon

---

[2] The Court may take judicial notice of its own docket. *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket. . . .").

[3] The plaintiffs did not specify in the complaint whether they were proceeding under § 523(a)(2)(A) or (B) but clarified in their post-trial brief that § 523(a)(2)(B) does not apply to this case.

themselves by unilaterally terminating the construction project before he could complete it.

Additionally, he maintains that the plaintiffs failed to carry their burden to establish the requisite

elements for a determination of non-dischargeability under either Code § 523(a)(2)(A) or (4).

A trial in this proceeding took place on December 14, 2017. I now set forth my findings

of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

### III. <u>Findings of Fact</u>

Ms. McGuinness and Mr. Duggan are the owners of a home located at 98 Prospect Street

in Easton, Massachusetts.  In 2013 they decided to add an attached garage and home office to

their home. Mr. Duggan was introduced to Mr. Gannon, a general contractor, by a mutual friend.

[Tr. 8]  When asked during the trial if Mr. Gannon gave him any specific assurances about his

background and abilities, Mr. Duggan, who himself was a licensed plumbing and HVAC

contractor, testified: "[Mr. Gannon said] we're going to get this up and do this[,]" and "it's going

to be great and you're going to love it."  [Tr. 51, 54] When asked if he checked any of Mr.

Gannon's references, Mr. Duggan testified that he relied on his friend's opinion that Mr. Gannon

could handle the project. [Tr. 53]

Mr. Duggin and Mr. Gannon had several meetings to develop a plan to construct a garage

and a home office to be attached to the home. [Tr. 9-10, 53-54] Mr. Gannon represented to Mr.

Duggan at the outset that he was a licensed and insured contractor. [Tr. 8, 11] Mr. Duggan, who

has experience with construction projects and permitting requirements, considered licensing and

insurance to be a prerequisite for hiring Mr. Gannon. [Tr. 11]  He added that, in his experience,

towns typically did not issue building permits to contractors unless they could certify their

insurance coverage or obtain a homeowner's written waiver. [Tr. 11, 48, 49]

The plaintiffs signed an initial contract for the project with Mr. Gannon's company, Gannon Construction Inc., on July 23, 2013. [Tr. 15, 59-60, 64, 93, 122-23] The original total contract price was $93,000. [Tr. 68] The plaintiffs paid a deposit of $10,000. [Tr. 68] The record does not establish to whom the deposit was made.  Ms. McGuinness testified that the contract provided that the contractor was licensed and insured. [Tr. 68] Because the contract was not introduced into evidence and the testimony was inconclusive, I cannot determine whether the provisions in the contract regarding insurance related to Mr. Gannon individually or to the construction company or whether Mr. Gannon, in his individual capacity, was also a signatory to the contract.

Between July of 2013 and April of 2014, Ms. McGuinness wrote checks totaling $174,125, of which $81,125 was paid for "add-on" work such as the construction of a firewood storage room and other projects not covered in the original contract. [Tr. 70] Certain checks were made payable to the construction company and others to Mr. Gannon personally.  [Tr. 120] Between September 12, 2013 and January 2014, plaintiffs wrote checks payable to Mr. Gannon personally totaling $81,246. [Tr. 120] No checks or other evidence of payment to Mr. Gannon or the construction company were introduced into evidence.  In all, the parties executed the initial contract and seven subsequent contracts for add-on work between November 13, 2013 and February 12, 2014.  [Tr. 79] Like the initial contract, none of the add-on contracts was introduced into evidence. It is unclear whether those contracts were between the plaintiffs and the construction company, Mr. Gannon personally, or both.

Work began on the project in August of 2013. [Tr. 69, 70] Things initially went well and according to plan, but by the fall of 2013 the project began encountering problems [Tr. 13-14, 69]  Mr. Duggan testified at the trial that as a result of improper grading following excavation

4

work overseen by Mr. Gannon, his property developed a water drainage problem. He testified

that "once the water problem started . . . [it] became pretty clear that [Mr. Gannon] was . . . way

over his head" and that he had "no clue" why the problem was happening. [Tr. 22, 39, 40, 55,

63]  He testified that Mr. Gannon disregarded safety and building codes when he incorrectly dug

a foundation and severed a pipe, resulting in flooding and mold damage to the laundry room in

his home. [Tr. 15-16, 20, 35] He also testified that a concrete floor poured by Mr. Gannon

cracked because he did not install necessary mesh. [Tr. 20] On another occasion, a heavy garage

door motor installed by Mr. Gannon's subcontractors fell from a joist while Mr. Duggan was

testing it, narrowly missing him. [Tr. 25-27] Mr. Duggan also testified that Mr. Gannon removed

gutters from his house without replacing them, allowed the standing water problem he created to

fester in the foundation, failed to install stairway guardrails, failed to properly install siding and

hired incompetent subcontractors.  [Tr. 15, 24, 37, 45] When he brought his concerns to Mr.

Gannon, Mr. Duggin testified, Mr. Gannon simply replied that he would "take care of it" or was

non-responsive. [Tr. 17, 20, 30, 45]  I credit Mr. Duggan's testimony on these points.

    With winter looming, the plaintiffs became concerned about the flooding problem and

spoke many times to Mr. Gannon who said he needed more money to finish the project.  [Tr. 22,

30] Mr. Duggan and Ms. McGuinness testified credibly at the trial that Mr. Gannon began

double-billing them and overcharging for materials and when they complained, he blamed his

secretary.  [Tr. 22, 23, 25, 32, 70-72, 81-82] Mr. Duggan noted that he was working long days,

and Mr. Gannon took advantage of his absence by asking Ms. McGuinness, who was at home

with a newborn and young children, for payments. [Tr. 22-23, 37-38, 44]

    Ms. McGuinness testified credibly that neither the work covered by the initial contract

nor the add-on work covered by later contracts was ever completed.  [Tr. 70-71, 78]  Mr. Gannon

repeatedly promised to do the add-on work if he was paid in advance but then did not complete

all the work despite receiving payment.  Ms. McGuinness testified:  "I was not familiar with the

process; I never had an addition put on, so I trusted his judgment. Apparently he misled us and I

was writing checks and getting nowhere." [Tr. 70-71]  For example, Ms. McGuinness testified

that she paid Mr. Gannon personally for the firewood storage room on November 20, 2013 by

check payable to him in the amount of $4,900, which check he immediately cashed.  [Tr. 72-73]

This represented payment in full but work on that room was never completed.  [Tr. 70]

Additionally, she testified that the plaintiffs paid in full for other add-on work, such as a garage

stairway and door, on which Mr. Gannon did not even start to work. [Tr. 70-71

Ms. McGuinness credibly testified that Mr. Gannon presented her with an add-on

contract dated December 24, 2013, which listed $2,000 due and owing for the firewood storage

room for which she had him paid in full on November 20, 2013. [Tr. 73] Further, she testified

that she received another add-on contract from Mr. Gannon on January 21, 2014, which reflected

amounts due for weather stripping for which she had also previously paid.  [Tr. 73-74] On

January 21, 2014, both plaintiffs met with Mr. Gannon to discuss the double-billing. [Tr. 74]  On

January 24, 2014, Mr. Gannon presented them with a new contract which still included amounts

for previously paid items.  [Tr. 74, 87]  According to Ms. McGuinness, his explanations

amounted to little more than "I forgot" or "I will take care of it."  [Tr. 31, 74, 87]

Mr. Gannon presented a further add-on contract on February 10, 2014 which still

contained double-charges. [Tr. 75] Ms. McGuinness testified credibly that there were at least ten

instances where Mr. Gannon tried to bill for items for which she had previously paid. [Tr. 82-84]

This caused Ms. McGuinness to decide to pay Mr. Gannon only when he finished a job instead

of in advance. Mr. Gannon then started to slow down his work. [Tr. 76, 89-90]  As a result, in

February 2014 the plaintiffs agreed, on a trial basis, to pay Mr. Gannon $3,500 per week because

Mr. Gannon said he needed the money to pay his vendor and labor costs.  [Tr. 76-77]

Ms. McGuinness testified credibly that she paid Mr. Gannon approximately $9,000 in

February of 2014, but that he still did not show up regularly, although he promised to do so

dozens of times. [Tr. 76-77, 89-90]  She made her last payment to him in April of 2014, although

she continued to ask him to return to complete add-on work such as an unfinished deck.  [Tr. 78]

He did come to the property intermittently after April and eventually completed the deck in July

of 2014.  [Tr. 78, 80] Ms. McGuinness persisted in asking Mr. Gannon to return to the property

after July to finish the concrete floor which was apparently part of the work outlined in the initial

contract, "but at this point . . , we weren't giving him any more money." [Tr. 78-80]

Ms. McGuinness testified that in the fall of 2014, the town building inspector appeared at

the plaintiffs' home to inquire about why the job, for which Mr. Gannon pulled a permit a year

prior, had not yet been completed. [Tr. 80, 88]

Ms. McGuinness credibly testified that she received her last communication from Mr.

Gannon on October 30, 2014, at a time when she was still asking him to return to the property to

complete unfinished work. [Tr. 88-89]  Indeed, the plaintiffs never terminated Mr. Gannon's

services.  [Tr. 65-66, 93] He just stopped showing up.  Ms. McGuinness testified about the state

of the project in the fall of 2014:

> [H]ere I am living with unfinished rooms flooding and my house is in disarray. I -
> - I couldn't even finish it, because I was out of money. The only way I could
> finish it was to get a . . . a special loan through the bank. . . [to hire another
> contractor] just to finish work that I had paid in full that he never even half-
> completed.

[Tr. 89]  She testified credibly that she paid a total of approximately $174,000 to Mr. Gannon or

the construction company through April of 2014, and that the total cost of the original project

and the add-ons was agreed upon by the parties to be less than $150,000. [Tr. 70, 90]

A new contractor finished the project after Mr. Gannon ceased work. [Tr. 89, 94]

Testimony about the cost for the new contractor to finish the work was inconclusive, but Ms.

McGuinness testified that the plaintiffs needed to take out a home mortgage to pay for it. [Tr. 94]

Ms. McGuinness summed up her experience with Mr. Gannon:

> I just feel that he lied to us. I mean, he totally misled us. I would never, ever, ever
> have hired a contractor to do a job that size, without -- that had no insurance.
> I -- he took money for things that he did not even begin to do. He took money of
> mine and he didn't even -- even hit the hammer one time, for certain things, and I
> never got that back.

[Tr. 91]

The plaintiffs attempted to locate insurance for Mr. Gannon or the construction company

that might be available to cover their losses, but by the time they did this, the insurance had

lapsed.  [Tr. 46-47, 50, 92]

All the foregoing testimony of Mr. Duggan and Ms. McGuinness was credible, and I

adopt it as part of my findings.

Some time in late 2015, more than a year after Mr. Gannon stopped work on the project,

the plaintiffs located Keith Duquette, a general contractor with over 37 years of experience in the

commercial and residential construction industry, to rectify the building code violations

identified by the town and to move forward with construction and re-permitting in the aftermath

of Mr. Gannon's work on the property.  [Tr. 96-99, 106, 116-118]  Mr. Duquette testified at the

trial that he did not contract directly with the plaintiffs but instead acted as a liaison between the

"HUD 203k consultant" (a term never explained) and town building officials. [Tr. 97, 118]  He

noted in his testimony that some things on the project were done according to the building code

and others were not and estimated the amount of overcharges on the project were between

$25,000 and $30,000, but he provided no detail or evidence to support this conclusion. [Tr. 110,

113] He prepared a report, as President of Streamline Development, LLC, listing numerous code

violations, unfinished items and other problems which occurred on the property, which report the plaintiffs introduced into evidence.  He identified numerous and varied problems with the work previously done at the property, including significant grade and drainage problems and structural issues in the foundation and in the new addition.  With respect to the drainage issue, he testified credibly: "The excavator or . . . the conditions of the site were allowing damning up against the -- the new addition and, because it was not drained properly, it was -- it was causing it to run into the new addition." [Tr. 101] In his testimony, Mr. Duquette went into extensive detail about the methods and materials he used to correct errors and deficiencies.  [Tr. 101-110]

Mr. Gannon testified at the trial that on the date the original contract was signed, July 23, 2013, the construction company carried liability and workers' compensation insurance with A.I.M. Mutual and that he pulled a building permit for the project on the company's behalf with the Town of Easton after providing it proof of insurance. [Tr. 124]  According to Mr. Gannon, the company's insurance was canceled in February of 2014.  [Tr. 125] Regarding Mr. Duquette's code violations report, Mr. Gannon testified that some of the code violations were the fault of Mr. Duggan, who installed some of the flooring himself, and that others were due to the slope of the property.  [Tr. 126-128]  "There was a drainage issue with the back yard, because of the way the foundations met up to the corners. It was a sloped hill; it was almost impossible. We went over it a few times . . . with the homeowners. . . The . . . way the yard was set up and the way the existing home and the new project was being built created a valley. There's really no way around it."  [Tr. 127] Other violations, he testified, involved matters outside the scope of the engagement or occurred because he was not given the opportunity to complete the project because he and his electrician were terminated by the plaintiffs, a fact disputed by the plaintiffs. [Tr. 128, 129, 130-138, 145, 150, 153]

Mr. Gannon testified that the construction company received $140,000 to $150,000 over the course of the project, and he could not explain why Ms. McGuinness believed the payments totaled $174,125.  [Tr. 141, 148, 151] He did recall that Ms. McGuinness paid approximately $81,000 in checks but could not recall if the payments were made to him, the construction company or jointly to both. [Tr. 151-52] He confirmed that the construction company, at first, received progress payments which changed to weekly payments at the beginning of 2014, which he said were to be for future services.  [Tr. 141-142] He testified that with respect to the total payments received, all services were completed and all materials were purchased; he maintained that he never engaged in double-billing the plaintiffs.  [Tr. 142-145, 148, 156]

With respect to the completion of work, Mr. Gannon testified that he was able to complete 90% of the project in the seven month period from July 2013 through February of 2014, after which it was difficult for him to work at the property because he "did not feel comfortable going there."  [Tr. 160-62, 165]  Despite the problems arising in early 2014, he testified that he believed he was not actually terminated from the project until late 2014 after a series of disagreements with the plaintiffs made him feel that he could not return to the property. [Tr. 154, 158]  He could not recall if he or the construction company received any payments after February 2014. [Tr. 163]

Apart from his testimony about insurance, I find Mr. Gannon's testimony to have been unreliable and unconvincing.  Crediting the testimony of the plaintiffs and Mr. Duquette, I find that Mr. Gannon's work was rife with building code violations, that his work caused the drainage problem at the plaintiffs' property, that Mr. Gannon attempted to double-bill the plaintiffs for work they had paid for and that in the second half of 2014, after the plaintiffs stopped advancing

him any more money, Mr. Gannon abandoned the project. He was never formally terminated by

the plaintiffs.

## IV. Conclusions of Law

Section 523 of the Code provides in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does
not discharge an individual debtor from any debt—. . .
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to
the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than statement
respecting the debtor's or an insider's financial condition; . . .
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or
larceny; . . .

11 U.S.C. § 523(a)(2)(A) and (4). The plaintiffs have the burden of proving each element of a

claim under § 523(a)(2)(A) and (4) by a preponderance of the evidence. *Palmacci v. Umpierrez*,

121 F.3d 781, 787 (1st Cir. 1997) (citing *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654,

661 (1991)).

In order to prevail under either of the above statutory provisions, the plaintiffs must first

establish that Mr. Gannon, individually, owed them a debt. *See Chen v. Huang (In re Huang)*,

509 B.R. 742, 754 (Bankr. D. Mass. 2014) (quoting 11 U.S.C. § 101(12) and 5(A))[4] ("[I]n the

context of the dischargeability proceeding, the bankruptcy court is not only tasked with

determining whether the circumstances for nondischargeability enumerated in § 523(a) are

established, but must also necessarily determine the scope of the debtor's 'liability on [the]

claim' and the creditor's 'right to payment.'").

As any first year law student knows, a corporation is "an independent legal entity,

separate and distinct from its shareholders, officers and employees." *Spaneas v. Travelers Indem.*

---

[4] A "debt" is defined by the Bankruptcy Code as a "liability on a claim." 11 U.S.C. § 101(12). A
"claim," in turn, is defined (in relevant part) as a "right to payment." 11 U.S.C. § 101(5)(A).

*Co.*, 423 Mass. 352, 354 (1996). Officers and directors of a corporation generally are insulated from liability for the debts of the corporation unless they personally guarantee them. Nevertheless, a corporation is a creature of the law that "can only act through its agents." *Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66 (1997).

"Under Massachusetts law, corporate officers are personally liable for any tortious activity in which they personally participate ... [even] while acting in [an] official corporate capacity." *Instant Image Print Shop, Inc. v. Lavigne, Keating, Halstead, Inc.*, No. 97WAD005, 1998 WL 201424, at *2 (1998 Mass. App. Div. 74, Apr. 15, 1998) (citing *Frontier Mgmt. Co., Inc. v. Balboa Ins. Co.*, 658 F. Supp. 987, 991, 993 (D. Mass. 1986)); *see also Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 938 (1st Cir. 1985) ("[I]t is settled that a corporate officer who commits a tort is personally liable for his actions and cannot seek refuge in the fact that he was acting for the corporation.") (citing *Refrigeration Discount Corp. v. Catino*, 330 Mass. 230, 235 (1953); *Coe v. Ware*, 271 Mass. 570, 572–73 (1973); 3A William Meade Fletcher, *et al., Fletcher Cyclopedia of the Law of Private Corporations*, § 1143, at 228–230 (1975)); *Frontier Mgmt. Co., Inc.*, 658 F. Supp. at 993 ("[C]orporate officers may be liable for their own fraudulent misrepresentations, and they are not protected merely because those representations were made while they were acting in their official corporate capacities.") (citing *Bond Leather Co., Inc.*, 764 F.2d at 938). "It is not necessary in all instances . . . to pierce the corporate veil in order to hold a corporate officer liable for a corporation's torts. . . A corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving, or ratifying

12

the act that injured the aggrieved party." *Townsends, Inc. v. Beaupre*, 47 Mass. App. Ct. 747, 751 (1999).

There is no dispute that Mr. Gannon owned the construction company, and the evidence presented at trial established that he was acting as the company's principal when he met with the plaintiffs to discuss the project, executed the initial contract, pulled a building permit, and personally performed construction services under the contract. In doing so, he personally participated in the alleged wrongdoing that injured the plaintiffs.

Applying the foregoing legal principles to these facts, I conclude that the corporate veil does not shield Mr. Gannon from personal liability to the plaintiffs to the extent that he made false representations or engaged in other fraud with respect to the construction project. Moreover, I am hard pressed to consider the debt at issue as a corporate debt, rather than a personal debt of Mr. Gannon's, where he listed the debt owed to the plaintiffs on his bankruptcy schedules without any indication that it was disputed or owed by a third party like his construction company, and he personally received $81,246 in payments from the plaintiffs. I turn then to the specific counts in the complaint.

**A. Count 1-Code § 523(a)(2)(A)**

"An action under § 523(a)(2)(A) involves three distinct categories of misconduct—false pretenses, false representation, or actual fraud—albeit with elements that overlap." *Privitera v. Curran (In re Curran)*, 554 B.R. 272, 284 (B.A.P. 1st Cir. 2016), *aff'd*, 855 F.3d 19 (1st Cir. 2017). In order to prevail, the complaining party must establish at least one category of misconduct, not all three. *James v. McCoy (In re McCoy),* 114 B.R. 489, 498 (Bankr. S.D. Ohio 1990) ("The statute, having been framed in the disjunctive, requires a showing of only one of the

three offending conducts."). The burden of proof and the burden of production rest with the

complaining party. *Palmacci,* 121 F.3d at 787.

 "'A false representation is an express misrepresentation[.]'" *Zacharakis v. Melo (In re*

*Melo)*, 558 B.R. 521, 559 (Bankr. D. Mass. 2016) (citation omitted). The United States Court of

Appeals for the First Circuit has determined that to establish a debt as nondischargeable because

it was obtained by a false representation, a creditor must prove the following: "1) the debtor

made a knowingly false representation or one made in reckless disregard of the truth, 2) the

debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false

statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance

was justifiable, and 6) the reliance upon the false statement caused damage." *McCrory v. Spigel*

*(In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (citing *Palmacci,* 121 F.3d at 786) (footnote

omitted).

 "The requirements for false pretenses are largely the same as those for false

representation, 'except that [the] requirement of a false representation is replaced by a

requirement of a false pretense, which is an implied misrepresentation or a false impression

created by conduct of the debtor.'" *Dewitt v. Stewart (In re Stewart)*, 592 B.R. 414, 434 (B.A.P.

1st Cir. 2018) (quoting *In re Curran*, 554 B.R. at 285)).

 "Actual fraud," the third category of misconduct in § 523(a)(2)(A), is not limited to fraud

effected by misrepresentations by the debtor. *Stewart*, 592 B.R. at 434 (citing, among other

cases, *Husky Int'l Elecs., Inc. v. Ritz*, ⸺ U.S. ⸺, 136 S. Ct. 1581, 1590 (2016)). In *Husky*, the

Supreme Court explained that "[a]lthough 'fraud' connotes deception or trickery generally, the

term is difficult to define more precisely." 136 S. Ct. at 1586. The Court further held that

14

"anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud[,]'" and interpreted "actual fraud" to encompass fraudulent conveyance schemes. *Id.* at 1586, 1590.

In claiming Mr. Gannon engaged in false representations, false pretenses or actual fraud, the plaintiffs rely on the evidence produced at trial establishing that despite representing that he was competent to complete the plaintiffs' project and that his work would be covered by insurance, the work performed by Mr. Gannon and his subcontractors was sub-standard and in violation of building codes; the project dragged on for months longer than it should have and was never completed by Mr. Gannon; Mr. Gannon did not have insurance when the plaintiffs attempted to make a damage claim; Mr. Gannon never accurately accounted for the payments he received which were in excess of the amounts set forth in the initial construction contracts and the add-on contracts; he double-billed for the same work and inflated bills for materials; and the plaintiffs' property was left in a damaged condition as a result of Mr. Gannon's unfinished and incompetently performed work despite his commitment to finish the job.

Although the record amply supports a finding that Mr. Gannon and his agents performed sub-standard work which caused the plaintiffs property damage, in a § 523(a)(2)(A) non-dischargeability proceeding, the plaintiffs must prove that Mr. Gannon made knowingly false representations or created false impressions with the intent to deceive them and induce their reliance or otherwise committed actual fraud.

The plaintiffs have failed to prove by a preponderance of the evidence that Mr. Gannon made false statements about his skills, the quality of his work, or his status as an insured contractor at the inception of the contract.  No evidence was presented at trial that Mr. Gannon made any specific representations to the plaintiffs about his level of skill or expertise other than

general assurances that he would do the job.  Such assurances do not rise to the level of fraudulent misrepresentations.

I also find no false statement made, false pretenses presented or actual fraud perpetrated by Mr. Gannon regarding the existence of insurance.  The record establishes that insurance coverage existed at the inception of the contract, otherwise Mr. Gannon would not have been able to obtain a building permit from the Town of Easton. I do find that insurance coverage was canceled at some point after commencement of the project, but the plaintiffs have not carried their burden to prove that Mr. Gannon or the construction company owed them a duty by contract (copies of the construction contracts were not placed into evidence) or by law to inform them about the canceled insurance.

The plaintiffs also allege that Mr. Gannon misrepresented his intention to show up at their property and complete the contracted-for work. This claim must be evaluated in different temporal contexts, both at the inception of the project and at later periods when he began to slow down his work. There can be no dispute based on the evidence presented that the original project and portions of the add-on work were never completed and that Mr. Gannon's efforts resulted in significant damage to the plaintiffs' property, costing them considerable time and money. Nevertheless, I find no knowingly false representations made by Mr. Gannon at the inception of the project about his intention to complete it.  He did perform considerable work in the first months after the initial contract was signed.  Indeed, the plaintiffs contracted with him for add-on work during the fall of 2013 and conceded at trial and in their post-trial brief that "he did a good job for a short time" but that his performance declined as the months passed. "If, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) . . . . If he did so intend at the time he made his promise, but subsequently

16

decided that he could not or would not so perform, then his initial representation was not false

when made." *Palmacci,* 121 F.3d at 787 (emphasis in original). To the extent the plaintiffs

contend that Mr. Gannon made false representations or acted on false pretenses when he

accepted money from them for add-on work he never started, such as the garage door and

stairway, I have no evidence as to when he received those payments or the proposed timing of

his performance.  I therefore cannot determine whether, at the time he received payment, he had

no intention to complete that work or whether he subsequently decided he could not perform.

I do find, however, that at some point after the original project began encountering

problems, Mr. Gannon realized he could not complete it, and that, as of February 2014, his work

slowed and he had no intention of completing the original project or all of the unfinished add-on

work. Nevertheless, he strung the plaintiffs along by conditioning future work on receipt of

weekly advance payments which he needed to pay his vendors and labor costs due to his other

apparent financial problems. He also repeatedly attempted, from November 2013 through

February 2014, to overcharge the plaintiffs by issuing inflated bills and add-on contracts. Mr.

Gannon's promises to show up and complete unfinished work while not intending to do so and

presenting false invoices could satisfy most of the elements for a successful claim for false

representation or false pretense under Code § 523(a)(2)(A).  *See Salehsari v. Aalam (In re

Aalam)*, 538 B.R. 812, 821 (Bankr. C.D. Cal. 2015) ("A misrepresentation may be a

misstatement of fact or a promise made with present intent not to perform."); *Giglio v.

Nisivoccia (In re Nisivoccia)*, 502 B.R. 139, 156-57 (Bankr. E.D.N.Y. 2013) (presenting an

invoice seeking payment for goods which are never delivered constitutes false pretenses and

submission of a duplicate invoice is a false representation that such amounts are due).

But there are missing links in the chain of proof which the plaintiffs were obliged to present in order to make out a claim for false pretense or false representation under § 523(a)(2)(A). First, the plaintiffs needed to prove their reliance upon Mr. Gannon's false statements caused them damage.[5] *In re Spigel*, 260 F.3d at 32.  Although the record establishes that Mr. Gannon presented false add-on contracts (which amounted to invoices), I cannot determine from the evidentiary record whether the plaintiffs ever actually paid him twice or whether Mr. Gannon otherwise extracted funds from the plaintiffs by over-charging for materials.  Indeed, Ms. McGuinness began scrutinizing the add-on contracts in November of 2013, and she routinely discovered his attempts to overcharge. Moreover, there is evidence that Mr. Gannon did do some work for the plaintiffs after February 2014. Without establishing how much they paid Mr. Gannon during and after February 2014 and what portion of those payments were actually earned by Mr. Gannon, the plaintiffs cannot carry their burden of proving they were damaged by Mr. Gannon's misrepresentations.[6] Also, based on Mr. Gannon's performance of some work at the property after February 2014, I cannot find that his conduct involved deception or trickery with wrongful intent, or the type of conduct which would amount to actual fraud.

---

[5] There is no dispute that the plaintiffs were damaged by the work performed and overseen by Mr. Gannon, but an evidentiary connection between the damage incurred and Mr. Gannon's § 523(a) violations is required.  Mr. Gannon's listing of a $161,692 debt owed to the plaintiffs in his schedule F is not an admission by him that the debt, or any portion of it, is nondischargeable. Rather, as the schedule itself referenced the plaintiffs' state court litigation, Mr. Gannon likely listed the amount of $161,692 based on the breach of contract claim in the state court complaint.

[6] For example, although Ms. McGuinness testified that she paid Mr. Gannon $9,000 in February 2014, she also testified that that he finished the deck project in July.  Accordingly, Mr. Gannon could have earned some portion of that amount. Without testimonial or documentary evidence on this point, I cannot conclude that he did not earn any of the $9,000 he received.

The second missing link in the § 523(a)(2)(A) chain is proof that the plaintiffs' reliance on Mr. Gannon's misrepresentations was justifiable. "Justifiable reliance is an intermediate level of reliance that falls somewhere between the more stringent 'reasonable reliance' guidepost and the lenient 'reliance in fact.'" *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 158 (Bankr. N.D. Ill. 2009) (citing *Field v. Mans*, 516 U.S. 59, 74-75 (1995)). To constitute justifiable reliance, a plaintiff's conduct does not have to "'conform to the standard of the reasonable man" as "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" *Field*, 516 U.S. at 70–71 (1995) (quoting Restatement (Second) of Torts § 545A cmt. b (Am. Law Inst. 1976)). To establish justifiable reliance, "a person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Field* at 71 (quoting Restatement (Second) of Torts § 541 cmt. a). "When determining if a plaintiff's reliance was justifiable courts consider whether there were any 'red flags' in the transaction that would have put the creditor on notice that further investigation was warranted." *Boyer Ins. Grp. v. Smith (In re Smith)*, Adv. No. 16–01075–j, 2017 WL 5198149, at *5 (Bankr. D.N.M. Nov. 9, 2017).

Here, there were several red flags which should have alerted the plaintiffs to make further inquiries before continuing to employ and pay Mr. Gannon. Ms. McGuinness testified that she first noticed Mr. Gannon's double-billing in November of 2013. She testified that in December 2013, Mr. Gannon billed her $2,000 for work on the firewood room that she had already paid him for in full the prior month. She testified that Mr. Gannon presented her with an add-on contract on February 14, 2014 which also contained double-billing. She estimated that he

attempted to double-bill the plaintiffs at least ten times. Mr. Duggan, who himself worked in the

building trades, testified that the property began experiencing drainage and flooding problems

during the winter of 2013-2014. He testified that when this started happening he realized Mr.

Gannon was in way over his head. The plaintiffs testified that Mr. Gannon frequently promised

he would show up at the property to work and then repeatedly did not show. Both plaintiffs

personally witnessed the lack of progress and, worse, the damage inflicted by the work Mr.

Gannon and his sub-contractors performed.  Yet, they agreed to contract with him for additional

add-on work, paid him in advance and never terminated him.  Mr. Gannon's shoddy work,

overstated invoices, insufficient excuses, and spotty attendance should have prompted the

plaintiffs to stop believing his promises and to stop paying him. Under these circumstances I

cannot find that the plaintiffs' reliance on Mr. Gannon's misrepresentations was justified.

**B. Count 2-Code § 523(a)(4)**

Code § 523(a)(4) excepts from discharge debts for "fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny." In count 2, the plaintiffs allege only fiduciary

defalcation. The *sine qua non* of such a claim is that the debtor must have been acting in a

fiduciary capacity when the defalcation occurred. If the debtor was not a fiduciary, there can be

no fiduciary defalcation. *MacPherson v. Marano (In re Marano)*, 568 B.R. 723, 730 (Bankr. D.

Mass. 2017) (citing *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir. 2002)).

The issue of whether a party is "acting in a fiduciary capacity" within the meaning of §

523(a)(4) is one of federal law. *Petrucelli v. D'Abrosca (In re D'Abrosca)*, No. RI 10–062, 2011

WL 4592338, at *5 (B.A.P. 1st Cir. Aug. 10, 2011). "In order to be acting as a fiduciary, a party

must be acting pursuant to an express or technical trust, not a trust which the law implies from a

contract." *Breed's Hill Ins. Agency, Inc. v. Fravel (In re Fravel)*, 485 B.R. 1, 14 (Bankr. D.

Mass. 2013) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)).  A technical trust "arises under statute or common law." *In re D'Abrosca*, 2011 WL 4592338, at *5

The plaintiffs maintain that Mr. Gannon acted in a fiduciary capacity when he held monies paid to him in advance of work performed and committed defalcation when he misappropriated portions of those monies through double-billing and over-charging, and when he did not provide them with an accounting.  They do not assert the existence of an express trust but maintain that Mr.'s Gannon's receipt of up-front monies amounted to a "technical trust."  They have supplied no statute or common law theory in support of this position other than to assert that a Massachusetts court would impose a constructive trust to prevent injustice.

'"In analyzing common law technical trusts, courts typically examine state law to determine if it imposes fiduciary obligations on the relevant party.'" *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 688 (B.A.P. 1st Cir. 2012) (quoting *M–R Sullivan Mfg. Co., Inc.*, *v. Sullivan (In re Sullivan)*, 217 B.R. 670, 675 (Bankr. D. Mass. 1998)).   "As with the exceptions to discharge in general, the concept of fiduciary capacity in . . . § 523(a)(4) is construed narrowly[,]" *In re D'Abrosca*, 2011 WL 4592338, at *5 (citations and footnote omitted), and the term '"fiduciary' does not apply to 'trusts that are imposed by law as a remedy.'" *In re Fahey*, 482 B.R. at 688 (quoting *In re Sullivan*, 217 B.R. at 675). "Consequently, 'implied or constructive trusts, and trusts ex maleficio do not establish fiduciary relationships under the Code.'" *Id*. (quoting *In re Sullivan*, 217 B.R. at 675 and citing *Davis v. Aetna Acceptance Co.*, 293 U.S. at 333 (1934)).

The plaintiffs have not established the existence of a technical trust under a statute or common law or that Mr. Gannon was acting in a "fiduciary capacity" for purposes of Code § 523(a)(4), a term that must be narrowly construed in the context of dischargeability of debts.  *See*

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934).  I therefore need not reach the standards

governing the defalcation element under § 523(a)(4) set forth in *Bullock v. BankChampaign,*

*N.A.*, 569 U.S. 267, 269, 274 (2013) (defalcation under § 523(a)(4) includes a culpable state of

mind requirement "involving knowledge of, or gross recklessness in respect to, the improper

nature of the relevant fiduciary behavior" and "[w]here actual knowledge of wrongdoing is

lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is

willfully blind to) a substantial and unjustifiable risk' that [the fiduciary's] conduct will turn out

to violate a fiduciary duty") (quoting Model Penal Code § 2.02(2)(c), p. 226 (AM. Law Inst.

1985)), but I note that a finding of defalcation would not be supported by this evidentiary record.

## V. <u>Ruling</u>

Based on the foregoing, the plaintiffs have failed to carry their burden to prove that under

Bankruptcy Code § 523(a)(2)(A) or (4) Mr. Gannon's debt to them should be excepted from

discharge. A separate judgment shall enter.


Dated: February 15, 2019                                      By the Court,

                                                             Melvin. S. Hoffman
                                                             United States Bankruptcy Judge

Counsel Appearing:          Robert Cabana, Esq.
                            Quincy, MA
                                    for the plaintiffs, Michelle McGuinness and William
                                    Duggin

                            Gary W. Cruickshank, Esq.
                            Boston, MA
                                    for the defendant, Patrick J. Gannon